IGERT, (a corporation), Arrow Transportation Company, Mississippi Valley Barge Line Company, American Commercial Barge Line Company, Union Barge Line Corporation, John I. Hay Company, Federal Barge Lines, Inc., and Waterways Freight Bureau, Plaintiffs,

v.

UNITED STATES of America and Interstate Commerce Commission, et al., Defendants.

Civ. A. No. 1195–NW.

United States District Court
N. D. Alabama,
Northwestern Division.

Nov. 12, 1962.

Belnap, Spencer, Hardy & Freeman, Chicago, Ill., Bowers, Dixon, Dunn & McDowell, Birmingham, Ala., for plaintiff.

Macon L. Weaver, U. S. Atty., Birmingham, Ala., Lee Loevinger, Asst. Atty. Gen., John H. D. Wigger, Atty., Dept. of Justice, Washington, D. C., Robert W. Ginnane, Gen. Counsel, Stanton P. Sender, Atty., Interstate Commerce Commission, Washington, D. C., for defendants.

Joseph F. Johnston, Birmingham, Ala., and James A. Bistline, Washington, D. C., for intervening defendants Alabama Great Southern R. R., New Orleans & N. E. R. Co., Southern Ry. Co.

John H. Doeringer, Chicago, Ill., for intervening defendant Illinois Cent. R. Co.

Before RIVES, Circuit Judge, and LYNNE and ALLGOOD, District Judges.

ALLGOOD, District Judge.

Invoking the jurisdiction of this duly constituted court of three judges under the provisions of 28 U.S.C.A. §§ 1336,

1398, 2284, and 2321–2325, and 5 U.S. C.A. § 1009, the plaintiffs, seven certificated common carriers by barge [1] and a non-profit association (Waterways Freight Bureau), whose membership includes the seven named barge lines, brought this action against defendants, United States of America and Interstate Commerce Commission,[2] to enjoin, set aside, annul and suspend the order of the Commission, Division 2, in Newsprint Paper-Tenn. & Ala. to Baton Rouge, La., 315 I.C.C. 117.[3]

The Commission determined in this case that the proposed reduced railroad rate on newsprint paper, in carloads, from Calhoun, Tennessee, and Childersburg and Coosa Pines, Alabama, to Baton Rouge, Louisiana, was just and reasonable, and that authority should be granted to establish and maintain the proposed rate without observing the long-and-short-haul provision of 49 U.S.C.A. § 4, commonly referred to as "fourth-section relief."

It is conceded, as noted by the Commission in its report, that while Coosa Pines is not served by barge, there have been shipments of newsprint paper by rail from that point to Baton Rouge, and the relief sought was based on market competition with Calhoun, and that if the rate from Calhoun becomes effective, there is no opposition to the establishment of the same rate from Coosa Pines and Childersburg, Alabama. Accordingly, we limit our consideration to the historical and factual background of rail and barge rates applied to shipments from Calhoun, Tennessee, to Baton Rouge, Louisiana.

Since the opening of the large newsprint plant of Bowaters' Southern at Calhoun, Tennessee, in 1954, the rail carriers had been transporting substantial quantities of newsprint paper to Baton Rouge, Louisiana. In August, 1958, the barge lines published a new and lower rate of $6.25 per ton, which diverted practically all the rail traffic between these points to the barge lines.

At this time the rail carriers, relying on information furnished by Bowaters', understood the total cost of movement by barge to be $10.72 per ton. This figure was arrived at by adding to the barge rate of $6.25 the additional wharfage, loading, and other accessorial charges which produced a total charge incurred in the barge movement that could be compared to the rail rate.

On October 23, 1958, the Commission approved the $10.72 rate from Calhoun, and, after a full investigation and hearings, affirmed its approval of the rate by order dated April 20, 1960, F.S.A. 34987, Newsprint Paper, Calhoun, Tenn., to Baton Rouge, La., 310 I.C.C. 171.

Although this first rail reduction from $13.60 to $10.72 became effective October 23, 1958, only 17 carloads of newsprint moved via rail from Calhoun to Baton Rouge through December, 1960, a period of 26 months. Of these 17 cars, 16 moved because of the incapacitating effect of a barge strike.

The erroneous supposition by the rail carriers that the $10.72 per ton rate would be competitive may be attributed to various commitments on the part of Bowaters' to the Port Authority at Baton Rouge, Louisiana, which had purchased equipment for unloading the barge freight which the shipper was amortizing to the Port Authority at a fixed rate per ton.

When the Commission gave final approval to the $10.72 per ton rail rate

1. American Commercial Barge Line Company, Arrow Transportation Company, Federal Barge Lines, Inc., Mississippi Valley Barge Line Company, Igert, Inc., John I. Hay Company, Union Barge Line Corporation.

2. Intervening as defendants, by leave of court, were Southern Railway Company, Alabama Great Southern Railroad Company, Central of Georgia Railway Company, Illinois Central Railroad Company, and New Orleans & Northeastern Railroad Company.

3. The Commission's report in this case embraces both Investigation and Suspension Docket No. 7463, and Fourth-Section Application No. 36584.

in April, 1960, it found that the amortization charge per ton of newsprint paid to the Port Authority was about to expire and that since there were certain other reductions in accessorial charges, the total cost of moving by barge for the future would approximate $9.75 per ton. It further found that the rail rate of $10.72 was about 10,% above the $9.-75 and concluded that it was lawful.

When it became apparent that the $10.72 rate was not competitive and would not attract any traffic between Calhoun and Baton Rouge, the rail carriers proposed $9.75 per ton.[4] While this rate closely approximates the average cost per ton of shipping newsprint by barge from Calhoun to Baton Rouge, there will remain a differential, ranging from 10 cents to 72 cents per ton in favor of the barge lines, representing a spread of 1% to 8% of the rate, depending on factors of efficiency in barge line operations.

It may be oversimplification to frame the issue in this case in terms of whether the Commission's report and order which authorizes the rail carriers "to charge less for longer than for shorter distances for the transportation" of newsprint is based upon adequate findings which in turn are supported by substantial evidence of record. Indeed, plaintiffs' attack upon such report and order contains multiple contentions which deserve more than passing comment.

While, narrowly, the Commission was called upon to determine whether the rail carriers had made out a special case to justify long-and-short-haul discrimination within the contemplation of 49 U.S.C.A. § 4, it was broadly engaged in performing its quasi legislative function of rate making, involving the exercise of a broad discretion. In Board of Trade of Kansas City, Mo. v. United States, 314 U.S. 534, 546, 62 S.Ct. 366, 372, 86 L.Ed. 432 (1942), the Supreme Court observed:

"The process of rate making is essentially empiric. The stuff of the process is fluid and changing— the resultant of factors that must be valued as well as weighed. Congress has therefore delegated the enforcement of transportation policy to a permanent expert body and has charged it with the duty of being responsive to the dynamic character of transportation problems."

The scope of judicial review of its orders[5] and the presumption that it has properly performed its official duties in the absence of clear evidence to the contrary[6] are too well settled and defined to require reiteration here.

■ We find all parties in agreement as to the standards to be applied by the Commission in determining whether the railroads have made out a "special case" to justify the long haul-short haul departure rates within the purview of 49 U.S.C.A. § 4. Since the decision of the Commission in Transcontinental Cases of 1922, 74 I.C.C. 48, it has consistently been held that a "special case" requires that departure rates meet four tests. As stated in that report, at page 71, the rates must,

" * * * (1) cover and more than cover the extra or additional expenses incurred in handling the

4. The proposed rate of $9.75 became $9.85 by application of Ex Parte 223 increases.

5. Virginian Ry. Co. v. United States, 272 U.S. 658, 47 S.Ct. 222, 71 L.Ed. 463 (1926); Interstate Commerce Commission v. Union Pacific R. Co., 222 U.S. 541, 32 S.Ct. 108, 56 L.Ed. 308 (1912); Mississippi Valley Barge Line Co. v. United States, 292 U.S. 282, 54 S.Ct. 692, 78 L.Ed. 1260 (1934), and United States v. Pierce Auto Freight Lines, 327 U.S. 515, 66 S.Ct. 687, 90 L.Ed. 821 (1946).

6. United States v. Chemical Foundation, 272 U.S. 1, 47 S.Ct. 1, 71 L.Ed. 131 (1926); Baltimore & Ohio Railroad Co. v. United States, 298 U.S. 349, 56 S.Ct. 797, 80 L.Ed. 1209 (1936); Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944) and Interstate Commerce Commission v. City of Jersey City, 322 U.S. 503, 64 S.Ct. 1129, 88 L.Ed. 1420 (1944).

traffic to which it applies; (2) be no lower than necessary to meet existing competition; (3) not be so low as to threaten the extinction of legitimate competition by water carriers; and (4) not impose an undue burden on other traffic or jeopardize the appropriate return on the value of carrier property generally, as contemplated in section 15a of the act * * *.''

In briefs and at oral argument it was conceded by all parties that the Commission's findings and conclusions with respect to the first and fourth of these criteria are supported, indeed compelled, by evidence in the record.

The essence, then, of contentions advanced by plaintiffs is that the Commission erred in placing on the barge lines the burden of proving that the second and third criteria were not met, whereas the burden was on the railroads to prove that they were. Additionally, plaintiffs protest that the Commission qualified the burden of proof resting upon the railroads to meet the second and third criteria by requiring the barge lines to go forward with evidence that the competitive water route is the lower cost route before it could or would find that those criteria have not been met.

■ In the report of the Commission we find no discussion of the burden of proof. At oral argument it was conceded by attorneys of record for both the original and the intervening defendants that the burden of proof was upon the rail carriers to make out the special case contemplated by 49 U.S.C.A. § 4. Both the language of the statute and the cases [7] which have construed it make it plain where the burden rests. In re-

ports entered in other proceedings [8] the Commission has clearly expressed its awareness that it is the applicant and not the protestant who labors the heavy oar.

In its report, 315 I.C.C. at page 122, the Commission thus succinctly stated its conclusions and findings:

" * * * The record is convincing that the proposed rate would be compensatory, and would improve the net revenues of the rail carriers. Also, a fair evaluation of the evidence indicates that the rate is not so low as to threaten the extinction of barge competition. It can be expected to attract a substantial share of the traffic to the railroads, which have suffered an almost total traffic diversion to the barge lines under the present rates. The shipper has spent a considerable sum on modern loading and unloading facilities by barge, and thus any slight rate edge in favor of the barge lines, such as that which will result under the proposal, should be sufficient to offset any service disadvantage over the barge route. Thus, under the proposed adjustment a substantial portion of this traffic may be expected to move over both the all-rail and the barge routes.

"In view of the foregoing, it appears to us that the proposed rate meets the tests laid down in Transcontinental Cases of 1922, supra, and that in view of the water competition at the more distant points in connection with the rate from Calhoun and the market competition in connection with the rate

7. E.g., Louisville & N. R. Co. v. United States, 225 F. 571 (D.C., W.D.Ky., 1915) aff'd. 245 U.S. 463, 38 S.Ct. 141, 62 L.Ed. 400 (1918).

8. Confectionery to Jacksonville, Fla., 272 I.C.C. 240 (Div. 2, 1948); Paper to Jacksonville, Fla., 245 I.C.C. 431 (Div. 2, 1941); Coke from Ohio River Points to Keokuk, Iowa, 246 I.C.C. 609 (Div. 3, 1941), and, on rehearing 273 I.C.C. 122

(Div. 2, 1948); Anthracite Coal to New England Territory, 277 I.C.C. 569 (Div. 2, 1950); Sulphur from La. and Tex., to Nashville and Old Hickory, 280 I.C.C. 423 (Div. 2, 1961); Pacific Coast Fourth Section Applications, 264 I.C.C. 36 (Div. 2, 1945) and Citrus Fruit from Florida to North Atlantic Ports, 266 I.C.C. 627 (Entire Comm., 1946).

from Coosa Pines, which conditions do not exist at the intermediate points, a special case has been presented within the meaning of section 4 of the act."

We are thus informed that the Commission carefully considered its report in the former proceeding, 310 I.C.C. 171, fairly evaluated the evidence in this record, and brought to bear upon its ultimate determination that a special case had been presented for Section 4 relief its expertise in the complex process of rate making.

Interwoven with the insistence of plaintiffs that the Commission improperly transposed the burden of proof is their contention that it construed Section 15a(3) of the Transportation Act of 1958 (49 U.S.C.A. § 15a(3)) to modify the strict and established requirements of 49 U.S.C.A. § 4. This argument is derived from the following observation of the Commission appearing in 315 I.C.C. at page 123:

" * * * On this record, we cannot find that the differential in favor of the barge lines which would result under the instant proposal is unlawful."

We find no reference to Section 15a (3) of the Transportation Act of 1958 in the report of the Commission. It may fairly be assumed that it considered unnecessary repetition of the following statement contained in its report in the prior proceeding, 310 I.C.C. at page 180:

"In view of our conclusions herein, based on the criteria in Transcontinental Cases of 1922, supra, it is not necessary to further consider if the provisions of Section 15a(3) of the act should be construed to liberalize the standards under which the applicants may be granted long-and-short haul relief from section 4 of the act in a water competitive situation."

Since the language relied upon is found in context with the request of the barge lines for an arbitrary differential of 10% in their favor without any showing of their operating costs we are constrained to the opinion that the Commission was simply disavowing disobedience of the congressionally declared National Transportation Policy[9] which might otherwise result from a failure to preserve the inherent advantages of water transportation when demonstrated by persuasive evidence.

We conclude that the orders of the Commission complained of herein are based upon adequate findings, supported by substantial evidence of record.

It is accordingly ORDERED, ADJUDGED and DECREED by the court that plaintiffs are not entitled to the relief for which they pray; that this action be and the same is hereby dismissed, and that the costs of court incurred herein be and the same are hereby taxed against plaintiffs, for which, unless presently paid, execution may issue.

---

9. National Transportation Policy (49 U.S. C. preceding §§ 1, 301, 901 and 1001) provides as follows:

"It is hereby declared to be the national transportation policy of the Congress to provide for fair and impartial regulation of all modes of transportation subject to the provisions of this Act * * *, so administered as to recognize and preserve the inherent advantages of each; to promote safe, adequate, economical, and efficient service and foster sound economic conditions in transportation and among the several carriers; to encourage the establishment and maintenance of reasonable charges for transportation services, without unjust discriminations, undue preferences or advantages, or unfair or destructive competitive practices; to cooperate with the several States and the duly authorized officials thereof; and to encourage fair wages and equitable working conditions; —all to the end of developing, coordinating, and preserving a national transportation system by water, highway, and rail, as well as other means, adequate to meet the needs of the commerce of the United States, of the Postal Service, and of the national defense. All of the provisions of this Act * * * shall be administered and enforced with a view to carrying out the above declaration of policy.