## A. L. MECHLING BARGE LINES, INC., ET AL. *v.* UNITED STATES ET AL.

No. 58. Argued February 18, 1964.—
Decided March 23, 1964.*

*Edward B. Hayes* argued the cause and filed briefs for appellants in No. 58.

*Harold E. Spencer* argued the cause for appellant in No. 59. With him on the briefs was *Richard M. Freeman.*

*Together with No. 59, *Board of Trade of the City of Chicago* v. *United States et al.,* also on appeal to the same court.

*Frank I. Goodman* argued the cause for the United States. On the brief were *Solicitor General Cox, Assistant Attorney General Orrick,* and *Robert B. Hummel.*

*H. Neil Garson* argued the cause for the Interstate Commerce Commission, appellee in both cases. With him on the brief was *Robert W. Ginnane.*

*Richard J. Murphy* argued the cause and filed a brief for New York Central Railroad Co., appellee in No. 59. *Leo P. Day* filed a brief for McNabb Grain Co. et al., appellees in No. 59.

MR. JUSTICE CLARK delivered the opinion of the Court.

This direct appeal from a final judgment of a three-judge District Court is but another episode in the long and continued struggle between the railroads and competing barge lines. In 1960 the Interstate Commerce Commission issued an order permitting a departure from the long- and short-haul provision of § 4 of the Inter-

---

[1] 24 Stat. 380, as amended, 71 Stat. 292, 49 U. S. C. § 4 (1):
"(1) It shall be unlawful for any common carrier subject to this part or part III to charge or receive any greater compensation in the aggregate for the transportation of passengers, or of like kind of property, for a shorter than for a longer distance over the same line or route in the same direction, the shorter being included within the longer distance, or to charge any greater compensation as a through rate than the aggregate of the intermediate rates subject to the provisions of this part or part III, but this shall not be construed as authorizing any common carrier within the terms of this part or part III to charge or receive as great compensation for a shorter as for a longer distance: *Provided,* That upon application to the Commission and after investigation, such carrier, in special cases, may be authorized by the Commission to charge less for longer than for shorter distances for the transportation of passengers or property, and the Commission may from time to time prescribe the extent to which such designated carriers may be relieved from the operation of the foregoing provisions of this section, but in exercising the authority conferred upon it in this proviso, the Commission shall not permit the establishment of any charge to or from the more distant point

state Commerce Act.[1] 310 I. C. C. 437. This order permitted the New York Central and connecting carriers to inaugurate a rate structure on its Belt Line west of Kankakee, Illinois, to eastern destinations under which lower rates were charged for some long hauls than for shorter ones on the same route. The District Court approved this action by dismissing a complaint to set aside the order. 209 F. Supp. 744. We noted probable jurisdiction, 374 U. S. 823, and now reverse the judgment with directions that the District Court vacate the order of the Commission and remand for further consideration in light of this opinion.

## I.

The New York Central operates the Kankakee Belt Line, which extends from South Bend, Indiana, through Kankakee, Illinois, and westward to Zearing, Illinois. That portion of the line west of Kankakee to Moronts, Illinois, roughly parallels the Illinois River in Northern Illinois and is used, in large part, to transport corn toward eastern markets. In the mid-1930's, the Illinois River was developed for barge movement and almost all of the corn

that is not reasonably compensatory for the service performed; and no such authorization shall be granted on account of merely potential water competition not actually in existence: *Provided further,* That any such carrier or carriers operating over a circuitous line or route may, subject only to the standards of lawfulness set forth in other provisions of this part or part III and without further authorization, meet the charges of such carrier or carriers of the same type operating over a more direct line or route, to or from the competitive points, provided that rates so established over circuitous routes shall not be evidence on the issue of the compensatory character of rates involved in other proceedings: *And provided further,* That tariffs proposing rates subject to the provisions of this paragraph requiring Commission authorization may be filed when application is made to the Commission under the provisions hereof, and in the event such application is approved, the Commission shall permit such tariffs to become effective upon one day's notice."

traffic was drawn away from the rails to the river, corn being moved to Chicago by barge and then shipped to the East by rail.[2]   Prior to 1957, barge rates from ports along the Illinois River to Chicago averaged 4.625¢ per hundred pounds of corn.[3]   From Chicago to eastern destinations, rail rates were 49¢ per hundred pounds of corn and 49.5¢ for corn products, so that the total shipping cost from ports on the Illinois River to the East was 53.625¢ for corn and 54.125¢ for corn products.   At the same time, rates for shipping corn via all-rail routes from origins on the Belt Line to eastern markets averaged 72¢ for corn and 72.5¢ for corn products, computed either as through rates or as a combination of a 23¢ rail rate to Chicago and the 49¢ or 49.5¢ rate from Chicago to the East.

The railroads chose to meet the barge competition by establishing a new rate structure on December 15, 1956, with a proportional rate [4] for rail shipments of corn to Kankakee which was competitive with the barge rate to Chicago.   The railroads continued the regular rates for transportation of corn to Kankakee from points on the Belt Line but allowed credit on reshipment from Kankakee to eastern points which resulted in a net rate of 6¢ [5] for transportation from Belt Line points to Kankakee. The 6¢ proportional rate applies only if the corn is milled in transit and only if it is reshipped to the East.   Because of the credit, the resulting rate system favors eastbound shipments of corn from Belt Line points west of Kankakee over similar shipments via the same route starting

---

[2] Reshipment of a commodity which has previously been shipped by barge is termed "ex-barge."   When prior transportation is by rail, reshipment is termed "ex-rail."

[3] Raised to 4.825¢ in December 1957.

[4] A rate which covers only a portion of the total transportation and is therefore only a portion of the total transportation charge.

[5] The net rate was 5¢ when the plan was established, later 5½¢, and now 6¢.

at Kankakee.  For this reason the rate structure vio-
lates the long- and short-haul prohibition of § 4 of the
Act and the railroads had to apply for authority for
fourth-section departures.  In 1957 a temporary fourth-
section order was entered authorizing the filing and im-
mediate application of the rates but not approving
them, "all such rates being subject to complaint, investi-
gation and correction if in conflict with any provision of
the Interstate Commerce Act."  The application was set
down for hearing, but the Commission did not exercise its
power to enter into a general investigation of the lawful-
ness of the rates under § 15 (1) or § 15 (7) of the Act,
41 Stat. 484–487, as amended, 49 U. S. C. §§ 15 (1), 15 (7).
Nor did the appellants file a formal complaint under § 13
of the Act, 24 Stat. 383–384, as amended, 49 U. S. C. § 13,
assailing the lawfulness of the rates.

Subsequently the Examiner denied § 4 relief because
Belt Line rates to Kankakee were less than the out-of-
pocket cost and were "lower than necessary to meet the
barge competition." [6]  The Commission reversed, hold-
ing that the proportional rate from origins along the
Kankakee Belt Line to Kankakee "has no independent
existence, but is an integral part of the rate which applies
on the through transportation from Belt origin" [7] to the
East.  The Commission found that the through combina-
tion rate was compensatory and that since the barges
attracted the corn grown adjacent to the river and the
rails attracted that along the Belt Line, the rates were
not lower than necessary to meet the barge rates and did
not constitute destructive competition.

The Chicago Board of Trade, which had intervened in
the proceeding, charged that the rates violated § 3 (1) of

---

[6] Proposed report, sheet 26.
[7] 310 I. C. C. 437, 450.

the Act[8] (as well as § 4) because they discriminated against Chicago grain merchants and processors. The Commission refused to pass upon the question as not being relevant to a § 4 proceeding. Nor did the Commission consider Mechling's contention that the rates violated § 3 (4) of the Act[9] because they discriminated between connecting carriers. Other objections that the rates violated § 1 (5) of the Act[10] as not being just and

[8] 24 Stat. 380, as amended, 54 Stat. 902, 49 U. S. C. § 3 (1):

"It shall be unlawful for any common carrier subject to the provisions of this part to make, give, or cause any undue or unreasonable preference or advantage to any particular person, company, firm, corporation, association, locality, port, port district, gateway, transit point, region, district, territory, or any particular description of traffic, in any respect whatsoever; or to subject any particular person, company, firm, corporation, association, locality, port, port district, gateway, transit point, region, district, territory, or any particular description of traffic to any undue or unreasonable prejudice or disadvantage in any respect whatsoever: *Provided, however,* That this paragraph shall not be construed to apply to discrimination, prejudice, or disadvantage to the traffic of any other carrier of whatever description."

[9] 24 Stat. 380, as amended, 54 Stat. 903–904, 49 U. S. C. § 3 (4):

"All carriers subject to the provisions of this part shall, according to their respective powers, afford all reasonable, proper, and equal facilities for the interchange of traffic between their respective lines and connecting lines, and for the receiving, forwarding, and delivering of passengers or property to and from connecting lines; and shall not discriminate in their rates, fares, and charges between connecting lines, or unduly prejudice any connecting line in the distribution of traffic that is not specifically routed by the shipper. As used in this paragraph the term 'connecting line' means the connecting line of any carrier subject to the provisions of this part or any common carrier by water subject to part III."

[10] 24 Stat. 379, as amended, 41 Stat. 475, 49 U. S. C. § 1 (5):

"All charges made for any service rendered or to be rendered in the transportation of passengers or property . . . as aforesaid, or in connection therewith, shall be just and reasonable, and every unjust and unreasonable charge for such service or any part thereof is prohibited and declared to be unlawful."

reasonable were likewise refused consideration. While the Commission found that the railroad's action was not a competitively destructive practice, it made no direct finding that the action did not violate the National Transportation Policy,[11] despite the appellants' insistence that it did.

The District Court approved the Commission's action in all respects and dismissed the complaint, holding "that the order in question was within the statutory power of the Commission, that it is supported by findings and conclusions based on substantial evidence, and that no prejudicial error occurred in the hearings before the Examiner and Commission." 209 F. Supp., at 749.

We have concluded that there is error in the holding in two respects: (1) The Commission should have passed upon the questions raised and evidence offered that the rates violated other sections of the Act; (2) the Commis-

---

[11] National Transportation Policy, 54 Stat. 899, 49 U. S. C., note preceding § 1:

"It is hereby declared to be the national transportation policy of the Congress to provide for fair and impartial regulation of all modes of transportation subject to the provisions of this act (chapters 1, 8, 12, 13 and 19 of this title), so administered as to recognize and preserve the inherent advantages of each; to promote safe, adequate, economical, and efficient service and foster sound economic conditions in transportation and among the several carriers; to encourage the establishment and maintenance of reasonable charges for transportation services, without unjust discriminations, undue preferences or advantages, or unfair or destructive competitive practices; to cooperate with the several States and the duly authorized officials thereof; and to encourage fair wages and equitable working conditions—all to the end of developing, coordinating, and preserving a national transportation system by water, highway, and rail, as well as other means, adequate to meet the needs of the commerce of the United States, of the Postal Service, and of the national defense. All of the provisions of this act (chapters 1, 8, 12, 13 and 19 of this title), shall be administered and enforced with a view to carrying out the above declaration of policy."

sion erred in failing to specifically consider and pass upon the question of whether the rates violated the National Transportation Policy.

## II.

Contentions were made and proof was offered by the Chicago Board of Trade of discriminatory violations of § 3 (1) of the Act, especially discrimination against whole corn by the milling-in-transit limitation. Under the conclusion of the Examiner that the fourth-section application should be denied, it was not necessary to pass upon the § 3 (1) contention. However, when the Commission took the opposite view on the § 4 application, the claim under § 3 (1) was ripe for decision. The Commission found that "[a]lthough the New York Central intends to remove the milling-in-transit limitation, these issues do not directly deal with the fourth-section principles here involved, but are properly matters which may be raised in investigation or complaint proceedings." 310 I. C. C. 437, 451.

Likewise, appellant Mechling claims discrimination against the barge lines at Chicago in violation of § 3 (4) of the Act, which prohibits carriers from practicing rate discrimination between connecting lines, including common carriers by water. The gist of the grievance is the assertion that the New York Central rate structure results in lower reshipping rates for ex-rail corn eastbound from Chicago than for ex-barge corn. Mechling urges that the Commission should have allowed full inquiry into this contention and should have determined whether § 3 (4) is being violated.

In defense of its position the Commission says that it does not grant relief under § 4 when the rates proposed result in violations of other sections of the Act. However, the Commission does not believe that this policy requires it to consider and decide, in a fourth-section pro-

ceeding, every allegation of rate unlawfulness, no matter how remote. Continuing, the Commission argues that since the attack on the rates was on a proportional factor, the 6¢, and not on the through charge, these other claims of unlawfulness were beyond the immediate § 4 issues. We cannot agree that the mechanism of the rate under attack permits of such easy dismemberment. Indeed, there is a definite tie-in that prevents the compartmentalization of the elements going into the combination. The 6¢ is not a separate charge but is the result of the railroad's combination rate. The shipper is charged 23¢ for the transportation of corn from points west to Kankakee, with milling-in-transit, and is allowed a 17¢ credit on the rate from Kankakee to the East, either direct or via Chicago, on the transportation of the resulting corn products. This combination rate has a real impact on the freight originating along the Belt Line. Further, the rate is not "remote," as is shown by the undisputed statement of counsel at argument that the barges have lost 53% of their carriage since it was made effective in 1957.

If the proceeding is splintered, contestants will be obliged to await the conclusion of § 4 proceedings before raising claims of violations under other sections of the Act. Not only would this be poor administration but it would result in manifest inequities and allow potential windfalls to some carriers.

Moreover, such splintering appears to be contrary to the consistent policy of the Commission in fourth-section proceedings. Over 50 years ago the Commission said:

"[T]he proviso authorizing this Commission to permit exceptions to the general prohibition of . . . [Section 4] is not a grant of arbitrary or absolute power, but its exercise must be limited and conditioned upon the presence in special cases of conditions and circumstances which would make such ex-

ceptions legal and proper and in no wise antagonistic to other provisions of the act." *Railroad Comm'n of Nevada* v. *Southern Pac. Co.*, 21 I. C. C. 329, 341 (1911).

In at least 10 subsequent cases,[12] as well as in its annual reports, the Commission has re-emphasized the same principle. See 34 I. C. C. Ann. Rep. 47. Furthermore, the application of all of the Act's prohibitions against discrimination "as a whole" furthers the purpose of the Congress in its enactment. The Senate Committee on Interstate Commerce once stated it this way:

"The provisions of the . . . [Interstate Commerce Act] are based upon the theory that the paramount evil chargeable against the operation of the transportation system of the United States as now conducted is unjust discrimination between persons, places, commodities, or particular descriptions of traffic. The underlying purpose and aim of the measure is the prevention of these discriminations, both by declaring them unlawful and adding to the remedies now available for securing redress and enforcing punishment . . . ." S. Rep. No. 46, 49th Cong., 1st Sess., 215–216 (1886).

---

[12] *Transcontinental Cases of 1922*, 74 I. C. C. 48, 71; *Commodity Rates on Lumber and Other Forest Products, In Carloads, From South Pacific Coast Territory To Points In Central Freight Association Territory*, 165 I. C. C. 561, 569; *Differential Routes To Central Territory*, 211 I. C. C. 403, 421; *Bituminous Coal to Buffalo, N. Y.*, 219 I. C. C. 554, 560; *Pig Iron To Butler, Pa.*, 222 I. C. C. 1, 2; *Iron and Steel to Minnesota*, 231 I. C. C. 425, 428; *Iron and Steel from Minnequa to Kansas, Nebraska, and South Dakota*, 278 I. C. C. 163, 168–169; *Coal and Coal Briquets in the South*, 289 I. C. C. 341, 376–377; *Passenger Fares, Hell Gate Bridge Route, New York, N. Y.*, 296 I. C. C. 147, 153; *Nepheline Syenite from Ontario, Canada, to the East*, 308 I. C. C. 561, 564–565.

In accordance with this policy, this Court declared in *New York* v. *United States*, 331 U. S. 284, 296 (1947), that "[t]he principal evil at which the Interstate Commerce Act was aimed was discrimination in its various manifestations." In the *Intermountain Rate Cases*, 234 U. S. 476, 485–486 (1914), the Court held that the Commission's power to relieve carriers from the requirements of § 4 depends upon

> "the facts established and the judgment of that body in the exercise of a sound legal discretion as to whether the request should be granted compatibly with a due consideration of the private and public interests concerned *and in view of the preference and discrimination clauses of the second and third sections.*" (Emphasis added.)

The fact that the long- and short-haul prohibition of § 4 is particularized does not require any different interpretation. The Congress might well have concluded that such a practice was so pernicious that it required specific condemnation.[13]

Finally, by hearing and determining, in a single proceeding, all charges of discrimination bearing upon the formal § 4 application, the Commission would further the legislative purpose as declared by the National Transportation Policy. It directed that the Interstate Commerce Act "shall be administered and enforced with a view to carrying out" its purpose "to encourage the establishment and maintenance of reasonable charges for transportation services, without unjust discriminations, undue preferences or advantages, or unfair or destructive competitive practices . . . ." 54 Stat. 899, 49 U. S. C., note preceding § 1.

---

[13] Friendly, The Federal Administrative Agencies: The Need for Better Definition of Standards, 75 Harv. L. Rev. 863, 884.

We do not say that such a rule of consolidation is an absolute. Many of these applications are filed each year and the Commission summarily disposes of the majority of them. Certainly where issues are not raised or brought to adversary position there is no need to consolidate. Likewise, where consolidation would inordinately delay the § 4 proceeding, good administration would require its denial. However, in the instant case, we see no practical reason why the merits of the several contentions should not have been reached.[14] To require the parties to begin anew and thus spawn several cases, all of which might have been easily disposed of in the § 4 proceeding, needlessly subjects appellants' claims to the rigors of circumlocution so deadly to effective administrative and judicial processes. This proceeding is now in its seventh year— during all of which period the rate under attack has been in force—and, still, basic questions as to the validity of the rate have not been considered by the Commission.

## III.

The Examiner entered a finding, which is uncontested, that the proportional rate here under attack did not cover the out-of-pocket costs of the railroad. In spite of this finding, the Commission gave little, if any, consideration to any resulting violation of the National Transportation Policy. There is no economic analysis, no expert testimony, no supporting data. Instead, the Commission found that the through rate, which it

---

[14] On Mechling's claimed violation of § 3 (4), proof on cross-examination was offered before the Examiner and refused as being relevant only in a "division case." The report of the Commission is silent on the point. It was stated before the Examiner that the record "made fairly plain" the contention which, if true, should permit the Commission to proceed on remand to pass upon it; if not, then the record should be supplemented by stipulation or by additional evidence before the Examiner, if necessary.

thought compensatory, rather than the Belt Line proportional rate, was controlling. Viewed in this manner, the Commission determined that the rate was not a destructively competitive practice. However, it supported this conclusion only with passing references to the first-year experience under the rate of two Illinois elevators and 10 Illinois River ports. One of the elevators had experienced no adverse effects from the rate while the other had lost some grain grown closer to the Belt Line. The 10 ports experienced about a 23% larger corn shipment to Chicago but the proportion of this increase to the whole grain movement is not shown. Nevertheless, the Commission concluded from this "that while corn grown adjacent to the Belt was attracted to the rails, that grown adjacent to the river remained with the barges. Thus, it is evident that the proposed rates are not lower than necessary to meet the barge competition." 310 I. C. C. 437, 452. In contradiction to this we have the undenied statement of counsel at argument, quoting statistics of the Chicago Board of Trade, that much corn traffic has been diverted from barge to rail since the rate went into effect, so that the barge lines carried 53% less corn to Chicago in 1963 than they did in 1957. The finding that the through rate was compensatory does not answer the question of whether the direct effect of the below-cost proportional rate on the Belt Line traffic is wholly at odds with the National Transportation Policy. Prior to the establishment of the rate, the barge lines enjoyed practically all of the traffic. However, the combination rate appears to have diverted appreciable traffic from the barge lines without any apparent profit to the railroad. Indeed, the Commission has not indicated whether any additional traffic resulted on the rail haul between Chicago or Kankakee and New York. We, therefore, do not believe it sufficient for the Commission to approve such a rate simply on a finding that the through

rate is reasonably compensatory and no lower than necessary to meet competition. In light of the facts present here, the claim of violation of the National Transportation Policy, raised and insisted upon by the appellants at all stages of the proceedings, must be specifically considered.

The judgment is, therefore, reversed and the cases are remanded to the District Court with directions to vacate the order of the Commission and remand for further proceedings consistent with this opinion.

*It is so ordered.*