**BALTIMORE AND OHIO CHICAGO TERMINAL RAILROAD COMPANY et al., Petitioners,**

v.

**UNITED STATES of America and Interstate Commerce Commission, Respondents,**

Central Vermont Railway, Inc., Duluth, Winnipeg and Pacific Railway, and the Detroit and Toledo Shore Line Railroad Company, Intervenors,

Burlington Northern Inc. and Union Pacific Railroad Company, Intervenors,

Duval Sales Corporation, International Minerals & Chemical Corporation, Evans Products Company and Pullman Leasing Company, Intervenors,

The Texas Mexican Railway Company, Intervenor.

**ALIQUIPPA AND SOUTHERN RAILROAD COMPANY et al., Petitioners,**

v.

**UNITED STATES of America and the Interstate Commerce Commission, Respondents,**

Duval Sales Corporation, International Minerals & Chemical Corporation, Evans Products Company and Pullman Leasing Company, Intervenors,

The Texas Mexican Railway Company, Intervenor.

Nos. 77–1714, 77–1732.

United States Court of Appeals, Third Circuit.

Argued July 25, 1978.

Decided Sept. 6, 1978.

John A. Daily, Richard J. Murphy, Philadelphia, Pa., Martin L. Cassell, Jr., Chicago, Ill., Emried D. Cole, Jr., Jacksonville, Fla., Donald E. Cross, Washington, D. C., Robert S. Davis, St. Louis, Mo., Louis T. Duerinck, Chicago, Ill., Charles B. Evans, St. Augustine, Fla., James L. Howe, III, Washington, D. C., Peter J. Hunter, Jr., Roanoke, Va., Howard D. Koontz, Chicago, Ill., Kinga M. LaChapelle, Albany, N. Y., William C. Leiper, Pittsburgh, Pa., Joseph J. Nagle, Chicago, Ill., John J. Paylor, Cleveland, Ohio, C. Harold Peterson, Minneapolis, Minn., John A. Ponitz, Detroit, Mich., John MacDonald Smith, San Francisco, Cal., Robert H. Stahlheber, Donal L. Turkal, St. Louis, Mo., Sidney Weinberg, Boston, Mass., for petitioners and intervening railroads in support of petitioners in No. 77–1714.

Samuel P. Delisi, Pittsburgh, Pa., C. H. Johns, Gen. Counsel, American Short Line R.R. Assn., Washington, D. C., for petitioners in No. 77–1732.

Robert L. Thompson, Dept. of Justice, Washington, D. C., for the United States.

Mark L. Evans, Gen. Counsel, Henri F. Rush, Associate Gen. Counsel, John J. McCarthy, Jr., I. C. C., Washington, D. C., for the Interstate Commerce Commission.

William P. Higgins, W. Donald Boe, Jr., Union Pacific Railroad Co., Omaha, Neb., Curtis H. Berg, Sr., William R. Power, Burlington Northern Inc., W. Charles Hogg, Jr., Edward C. Toole, Jr., Clark, Ladner, Fortenbaugh & Young, Philadelphia, Pa., for Burlington Northern Inc. and Union Pacific Railroad Co., intervenors in support of respondents.

Harold E. Spencer, Thomas F. McFarland, Jr., Chicago, Ill., for intervening Private Car Interests in Support of respondents; Belnap, McCarthy, Spencer, Sweeney & Harkaway, Chicago, Ill., of counsel.

Before ADAMS, WEIS and HIGGINBOTHAM, Circuit Judges.

## OPINION OF THE COURT

ADAMS, Circuit Judge.

Petitioners in these consolidated cases [1] request us to set aside an order of the Interstate Commerce Commission (ICC) entered on April 7, 1977, in Ex Parte No. 289, "Remittance of Demurrage Charges by Common Carriers of Property by Rail." [2] By its order, the ICC adopted a regulation

---

1. In No. 77–1714, a petition was filed on behalf of thirty-three railroad petitioners and four intervening railroads for review of the ICC's order in Ex Parte 289. In No. 77–1732, a petition for review was filed by the 214 member railroads of the American Short Line Railroad Association. Both petitions are brought pursuant to 28 U.S.C.A. §§ 2321, 2342, and 2344 (1978) to enjoin a final order of the ICC.

2. 353 I.C.C. 567 (1977); 42 Fed.Reg. 19146; 39390 (1977) (to be codified in 49 C.F.R. § 1254.10).

requiring the remittance to freight car owners of all demurrage charges collected by the delivering carrier that are in excess of ten dollars per day per car.[3] Specifically, petitioners maintain that the order exceeds the statutory power of the agency; that it is arbitrary, capricious, and without rational basis; and that it fails to comply with the Administrative Procedure Act (APA)[4] and the Interstate Commerce Act (ICA).[5]

For the reasons set forth below, we deny petitioners' request.

## I.

The regulation at issue is a recent attempt by the ICC to deal with the long-standing shortage in this country of railroad freight cars.[6] The car shortage, resulting from both an insufficient supply and an inefficient utilization of freight cars, is an outgrowth of the present national carpool system. Under the system, the freight cars that are owned by *individual* railroads constitute a single, common pool, used by *all* rail carriers. Thus, the same loaded freight car is transported over the lines of different connecting carriers to the ultimate destination point. While more efficient than the earlier practice of shifting freight from the car of one carrier to the car of another, the pool system has at the same time made it more advantageous economically for railroads to utilize the freight cars of the originating carriers than to purchase and maintain their own. The national freight car shortage is the acknowledged result.[7]

During the past several years, the ICC has taken a number of major actions in an attempt to ease the car shortage: (1) it has adopted various "car service" rules to regulate the placement and movement of freight cars;[8] (2) it has established a uniform schedule of "per diem" charges, which are those incurred daily by one railroad for the use of another's cars;[9] (3) it has added an "incentive" element to the basic per diem rate;[10] and (4) it has imposed an increase in demurrage charges.[11]

Ex Parte No. 289, the proceeding in question here, was instituted in October 1972, to determine whether remittance of the penalty portion[12] of the demurrage charges to the carriers owning the cars would create

---

3. Demurrage is the charge imposed upon shippers and receivers for the detention of freight cars beyond the allotted free time period for loading and unloading. Traditionally, all demurrage payments have been made to and retained by the delivering carriers. Under the ICC order at issue here, these payments would continue, but the funds collected in excess of ten dollars per day per car would be remitted by the delivering railroads to the freight car owners.

4. 5 U.S.C.A. § 551 *et seq.* (1977 & Supp.1978).

5. 49 U.S.C.A. § 1 *et seq.* (1949, 1951 & Supp. 1978).

6. *See United States v. Florida E. Coast Ry. Co.,* 410 U.S. 224, 230–31, 93 S.Ct. 810, 35 L.Ed.2d 223 (1973); *United States v. Allegheny-Ludlum Steel Corp.,* 406 U.S. 742, 743–46, 92 S.Ct. 1941, 32 L.Ed.2d 453 (1972); Note, *The Freight Car Shortage and ICC Regulation,* 85 Harv.L. Rev. 1583 (1972).

7. *See, e. g., United States v. Allegheny-Ludlum Steel Corp.,* 406 U.S. at 745–46, 92 S.Ct. 1941.

8. *See, e. g., ICC v. Oregon Pac. Indus., Inc.,* 420 U.S. 184, 95 S.Ct. 909, 43 L.Ed.2d 121 (1975); *United States v. Allegheny-Ludlum Steel Corp.,*

406 U.S. 742, 92 S.Ct. 1941, 32 L.Ed.2d 453; *Reading Co. v. Commodity Credit Corp.,* 289 F.2d 744 (3d Cir. 1961).

9. *See Union Pac. R. R. Co. v. United States,* 300 F.Supp. 318 (D.Nev.1969); *Boston & Me. R. R. v. United States,* 297 F.Supp. 615 (D.Mass.), *aff'd per curiam,* 396 U.S. 27, 90 S.Ct. 196, 24 L.Ed.2d 142 (1969).

10. *See United States v. Florida E. Coast Ry. Co.,* 410 U.S. at 224, 93 S.Ct. 810, *on remand,* 368 F.Supp. 1009 (M.D.Fla.1973), *aff'd mem.,* 417 U.S. 901, 94 S.Ct. 2595, 41 L.Ed.2d 207 (1974).

11. *See General Mills, Inc. v. United States,* 364 F.Supp. 1278 (D.Minn.1973).

12. Demurrage charges consist of both penalty and compensatory elements. *See ICC v. Oregon Pac. Indus., Inc.,* 420 U.S. at 189–191, 95 S.Ct. 909. The latter element is that portion of the demurrage charge which serves to compensate the railroad for the additional per diem payments it must make to the car owner as a result of the loading or unloading delay. The remainder of the demurrage charge is understood as the penalty portion.

an added incentive for such carriers to acquire additional cars. Following notice in the *Federal Register*[13] and submission of written statements by a number of the ninety-seven participating parties, the ICC, on April 25, 1975, issued its Interim Report.[14] The Report adopted the principle of the proposed remittance rule and reopened the proceeding for receipt of additional evidence regarding the plan's feasibility and costs. Following notice of the proposed further rulemaking,[15] one hundred-eighteen parties submitted additional information to the ICC.

On April 7, 1977, the ICC issued its Report and Order in Ex Parte No. 289.[16] It concluded that adoption of the proposed remittance rule would be beneficial to the public and the rail industry, as well as administratively feasible. Consequently, the agency directed that the rule become effective on July 6, 1977. However, the effective date was subsequently stayed by the ICC pending judicial review.

13. 37 Fed.Reg. 22884 (1972).

14. 349 I.C.C. 411 (1975).

15. 40 Fed.Reg. 18797 (1975).

16. 353 I.C.C. 567 (1977).

17. Pub.L.No.94–210, § 211, 90 Stat. 31, 46 (1976). In its Interim Report of April 1975, the Commission found that it had jurisdiction under three car service provisions of the ICA, 49 U.S.C.A. §§ 1(11), 1(14)(a), and 1(15) (1959 & Supp.1978). Subsequent to the Report, the 4R Act was enacted, and on March 3, 1976, the ICC solicited comments on the effect of the new legislation. In its final Report and Order of April 1977, as well as in its brief submitted to this Court, the ICC, while continuing to assert that it has authority to promulgate the remittance rule under the three above-mentioned sections, relied principally upon the amended version of § 1(6). In light of our holding that § 1(6) provides the ICC with the necessary authority to promulgate the demurrage remittance rule in question it is unnecessary to decide whether jurisdiction might properly be founded upon §§ 1(11), 1(14)(a), and 1(15) as well.

18. 49 U.S.C.A. § 1(6), (Supp.1978), in full, provides:

It is made the duty of all common carriers to the provisions of this chapter to establish,

## II.

### A.

The principal argument made in support of the petition to set aside the order in question is that the ICC lacks a statutory base to promulgate the demurrage remittance rule. The ICC, in turn, contends that it does have the requisite authority under 49 U.S.C.A. § 1(6) (Supp.1978), as amended by the Rail Revitalization and Regulatory Reform Act of 1976 (4R Act).[17]

The 4R Act added a provision to § 1(6) which states that "[d]emurrage charges shall be computed, and rules and regulations relating to such charges shall be established, in such a manner as to fulfill the national needs with respect to (a) freight car utilization and distribution, and (b) maintenance of an adequate freight car supply available for transportation of property."[18] Petitioners assert that the statutory directive that "demurrage charges shall be computed" cannot properly be interpreted to authorize the ICC to "divide"

observe, and enforce just and reasonable classifications of property for transportation, with reference to which rates, tariffs, regulations, or practices are or may be made or prescribed, and just and reasonable regulations and practices affecting classifications, rates, or tariffs, the issuance, form, and substance of tickets, receipts, and bills of lading, the manner and method of presenting, marking, packing, and delivering property for transportation, the facilities for transportation, the carrying of personal, sample, and excess baggage, and all other matters relating to or connected with the receiving, handling, transporting, storing, and delivery of property subject to the provisions of this chapter which may be necessary or proper to secure the safe and prompt receipt, handling, transportation, and delivery of property subject to the provisions of this chapter upon just and reasonable terms, and every unjust and unreasonable classification, regulation, and practice is prohibited and declared to be unlawful. Demurrage charges shall be computed, and rules and regulations relating to such charges shall be established, in such a manner as to fulfill the national needs with respect to (a) freight car utilization and distribution, and (b) maintenance of an adequate freight car supply available for transportation of property.

demurrage revenues between the delivering carrier and the owner of the car.

■■■■ In analyzing a question of statutory construction, the Supreme Court has said that it accords deference to the interpretation given the statute by the officers or agency charged with its administration. *Udall v. Tallman.*[19] While the agency's interpretation is by no means controlling,[20] to sustain the ICC it is necessary only that we find its interpretation to be a reasonable one.[21] As *Tallman* recognized, "we need not find that [an agency's] construction is the only reasonable one or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings."[22]

Petitioners in the present situation argue that the plain meaning of the phrase "demurrage charges shall be computed" should control, that previous use of the term by the ICC does not indicate an understanding that it confers upon the agency the power to divide demurrage revenues, and that the division of revenues is such a substantial change from prior practice that an express authorization by Congress to divide demurrage charges is required.

While the language of § 1(6) does not specifically authorize remittance to car owners, it is equally clear that the statute does not prohibit such an arrangement. By focusing solely upon the phrase "shall be computed", petitioners tend to restrict what appears to be the rather broad authorization granted to the ICC by the 1976 amendments to § 1(6).[23] Indeed, the provision not only directs the ICC to compute demurrage charges with the purpose of enhancing freight car supply, utilization, and distribution but also mandates the agency to establish "rules and regulations relating to such charges."

The legislative history of the 4R Act further indicates the appropriateness of a broad reading of the amendment to § 1(6). The statute encompassing the provision was enacted by Congress for the general purpose of revitalizing a sagging railroad industry.[24] It was the declared policy of Congress, among other things, to balance the needs of carriers, shippers, and the public; to help place the nation's railroads in a position competitive with that of other modes of transportation, so as to promote more adequate and efficient transportation services; and to increase the attractiveness of investing in railroads and rail-service-related enterprises.[25]

One of the means of fulfilling these aims was the amendment pertaining to demurrage charges. That provision, comprising only eight lines in the 120-page statute, understandably did not attract much congressional comment.[26] The few portions of the legislative history that deal with the

---

**19.** 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965). *Accord, Batterton v. Francis,* 432 U.S. 416, 424, 97 S.Ct. 2399, 53 L.Ed.2d 448 (1977); *Lehigh & New Eng. Ry. Co. v. ICC,* 540 F.2d 71, 80 (3d Cir. 1976), *cert. denied,* 429 U.S. 1061, 97 S.Ct. 784, 50 L.Ed.2d 776 (1977); *Lucas Coal Co. v. Interior Bd. of Mine Operations Appeals,* 522 F.2d 581, 584 (3d Cir. 1975).

**20.** *See Batterton v. Francis,* 432 U.S. at 424, 97 S.Ct. 2399.

**21.** *See Udall v. Tallman,* 380 U.S. at 16, 85 S.Ct. 792.

**22.** *Udall v. Tallman,* 380 U.S. at 16, 85 S.Ct. at 801, *quoting with approval Unemployment Compensation Comm'n v. Aragon,* 329 U.S. 143, 153, 67 S.Ct. 245, 91 L.Ed. 136 (1946).

**23.** As this Court stated in *Lehigh and New Eng. Ry. Co. v. ICC,* 540 F.2d at 80, "[s]urely, the scope of the Commission's responsibilities under the Act requires a generous construction of its statutory authority."

**24.** *See* Pub.L.No.94–210, § 101, 90 Stat. 31, 33 (1976) (codified at 45 U.S.C.A. § 801 (Supp. 1978)).

**25.** *Id.*

**26.** The debates on the floors of the Senate and House of Representatives fail to offer any insight into congressional thought with regard to the demurrage provision, for the section was never mentioned other than in the reading of the bill. Rather, the debates focused on the Final System Plan and other provisions of the 4R Act involving financial assistance by the federal government to the railroads. *See* 121 Cong.Rec. 38117, 38441, 41334, 41888, 42169 (1975); 122 Cong.Rec. H92, S271, S741, H401 (daily eds. Jan. 20, 21 & 28, 1976).

demurrage provision, however, lend support to the ICC's broad interpretation of § 1(6).

During the initial review of the railroad reform legislation in the House of Representatives, the Committee on Interstate and Foreign Commerce was informed of the ICC's pending consideration of the demurrage remittance rule in Ex Parte No. 289, and it gave no indication of its disapproval.[27] This is of special significance in light of the Supreme Court's holding in *Zuber v. Allen* [28] that an agency's interpretation of the statute it is charged with implementing "carries most weight when the administrators participated in drafting and directly made known their views to Congress in Committee hearings. . . . In such circumstances, absent any indication that Congress differed with the responsible department, a court should resolve any ambiguity in favor of the administrative construction, if such construction enhances the general purposes and policies underlying the legislation." [29] In addition, we find substantial support for the ICC's interpretation of the demurrage provision in the Joint Explanatory Statements of the Conference Committee. It declared with regard to the section: "Other amendment made by this title: . . . *requires* the Commission to establish rules and regulations for the computation of demurrage charges so that freight car utilization is maximized and *car owners receive adequate compensation* . . . ." [30]

In light of this statutory history, and the goals of the legislation, we are unable to say that the ICC's view that § 1(6) authorizes it to promulgate the present demurrage remittance rule is an unreasonable one.

### B.

Petitioners also contend that the order in Ex Parte No. 289, even if within the ICC's power, must be set aside as arbitrary and capricious and as unsupported by substantial evidence. In this regard, petitioners assert that the applicable standard of review is the one established by the APA 5 U.S.C.A. § 706 (1977), and that the ICC determination, by failing to demonstrate a sufficient nexus between demurrage remittance and improved freight car utilization and supply, cannot survive such review.

Section 706(2) requires, *inter alia,* that the reviewing court hold unlawful and set aside agency action, findings, and conclusions found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . [or] (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute . . . ." [31] Since the present proceeding involves notice and comment rulemaking

27. The Committee received a letter from ICC Acting Chairman O'Neal with his comments on the proposed 4R Act. In his analysis of the demurrage provision, the Acting Chairman stated:

> Another proceeding, Ex Parte No. 289, *Remittance of Demurrage Charges by Common Carriers of Property by Rail,* concerns a proposed rule requiring remittance to the car owner by a non-owning road of all demurrage charges in excess of $10 per day per car. The purposes of the proposals are to create an added incentive for the car owner to acquire additional cars and to remove any inducement to the non-owner to encourage detention of foreign cars in order to benefit from collection of demurrage charges.

*See* Report of the Committee on Interstate and Foreign Commerce, H.R.Rep. No. 725, 94th Cong., 1st Sess. 240 (1975).

28. 396 U.S. 168, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969).

29. *Id.* at 192, 90 S.Ct. at 327.

30. Final Conference Report, S.Rep. No. 595 and H.R.Rep. No. 781, 94th Cong., 2d Sess. 135, *reprinted in* [1976] U.S.Code & Admin.News, pp. 149, 150 (emphasis added). Similar statements are found in the other committee reports which discussed the demurrage provision. *See* Conference Report, S.Rep. No. 585 and H.R. Rep. No. 768, 94th Cong., 1st Sess. 128 (1975); Report of the Committee on Interstate and Foreign Commerce, H.R.Rep. No. 725, 94th Cong., 1st Sess. 73 (1975).

31. *Id.* 5 U.S.C.A. §§ 556 and 557 (1977) establish procedural requirements for hearings mandated by §§ 553 or 554.

under 5 U.S.C.A. § 553 (1977),[32] and is not one "reviewed on the record of an agency hearing provided by statute,"[33] the "substantial evidence" test of § 706(2)(E) would not appear to be applicable.[34] As we recently stated in *Ford Motor Co. v. United States*,[35] the basic standard of review in proceedings such as this one is the "arbitrary and capricious" standard of § 706(2)(A).[36]

It is generally settled that the scope of review of agency actions under § 706(2)(A) is narrow.[37] A unanimous Supreme Court noted in *United States v. Allegheny-Ludlum Steel*[38] that "[w]e do not weigh the evidence introduced before the Commission; we do not inquire into the wisdom of the regulations that the Commission promulgates, and we inquire into the soundness of

the reasoning by which the Commission reaches its conclusions only to ascertain that the latter are rationally supported."[39] Accordingly, we examine the evidence and arguments offered by the ICC in order to determine whether the demurrage remittance rule is "rationally supported."

In its Interim Report and final Report and Order, the ICC extensively discussed the arguments of both proponents and opponents of the remittance rule, and concluded that the rule would likely achieve its intended purpose of increasing freight car supply and utilization. Its reasoning was forthright, relying upon "the fundamental economic proposition that a greater return on an investment will provide an increased incentive to invest in that item, whether it be stocks, cars, or as in this case, freight cars."[40] While admitting that return on

32. 5 U.S.C.A. § 551 (1977) defines "rule" as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency . . . ." "Rule making" is defined in that same section as "agency process for formulating, amending, or repealing a rule." *Id.* Ex Parte No. 289 clearly falls within this category of proceeding.

33. 5 U.S.C.A. § 706(2)(E) (1977).

34. *See, e. g., Weinberger v. Hynson, Westcott & Dunning, Inc.,* 412 U.S. 609, 622 n. 19, 93 S.Ct. 2469, 37 L.Ed.2d 207 (1973); *American Iron and Steel Inst. v. EPA,* 568 F.2d 284, 296 (3d Cir. 1977); *Asphalt Roofing Mfrs. Ass'n v. ICC,* 567 F.2d 994, 1002 n. 5 (D.C. Cir. 1977); *National Nutritional Foods Ass'n v. Weinberger,* 512 F.2d 688, 700–701 (2d Cir.), *cert. denied,* 423 U.S. 827, 96 S.Ct. 44, 46 L.Ed.2d 445 (1975); K. Davis, Administrative Law of the Seventies, § 29.01–3 (1976).

35. 569 F.2d 196 (3d Cir. 1977), *cert. denied,* 436 U.S. 944, 98 S.Ct. 2844, 56 L.Ed.2d 784 (1978).

36. *See id.* at 198.

37. *See, e. g. Bowman Transp. v. Arkansas Best Freight Sys.,* 419 U.S. 281, 285–86, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974); *United States v. Allegheny-Ludlum Steel Corp.,* 406 U.S. at 749, 92 S.Ct. 1941; *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *Ford Motor Co. v. United States,* 569 F.2d at 198–99. Several courts of appeals, including this one, have observed that in notice and comment rule-making the "arbi-

trary and capricious" and "substantial evidence" criteria tend to converge. *See, e. g., Synthetic Organic Chem. Mfrs. Ass'n v. Brennan,* 503 F.2d 1155, 1158 (3d Cir. 1974), *cert. denied,* 420 U.S. 973, 95 S.Ct. 1396, 43 L.Ed.2d 653 (1975); *Associated Indus., Inc. v. United States Dep't of Labor,* 487 F.2d 342, 350 (2d Cir. 1973) (Friendly, J.). *See generally* Friendly, *"Some Kind of Hearing",* 123 U. of Pa.L. Rev. 1267, 1313 (1975); Pedersen, *Formal Records and Informal Rulemaking,* 85 Yale L.J. 38, 46–51 (1975). Of course, an agency decision without *any* evidentiary support, in the administrative record will not be upheld. The evidence presented, however, need only establish a rational basis, rather than substantial support, for the agency action. *See Almay Inc. v. Califano,* 569 F.2d 674, 680–81 (D.C. Cir. 1978).

38. 406 U.S. 742, 92 S.Ct. 1941, 32 L.Ed.2d 453 (1972).

39. *Id.* at 749, 92 S.Ct. at 1946. *Accord, Ford Motor Co. v. United States,* 569 F.2d at 199.

40. 353 ICC at 589. As the ICC continued:
As demurrage regulations presently exist, the delivering carrier, who may not own one freight car, is nevertheless entitled to the entire demurrage charge even though this sum may far exceed any costs incurred. In addition, there is no indication that this demurrage revenue is presently being used by the delivering road to purchase additional cars. This money is, therefore, a bonus to a carrier who has no interest in whether or not a car is being detained. However, the car owner, whether private or foreign road, has its equipment detained and unavailable for

investment would be only one of several factors affecting a decision whether to purchase freight cars, the ICC claimed that the rule would at least tend to encourage such decision. Moreover, the agency concluded that the remittance rule would have an affirmative effect upon the supply of cars. Pointing to evidence adduced in earlier proceedings that large sums of demurrage charges remained uncollected by the carriers, the ICC reasoned that the requirement of the remittance rule, which is based on billed rather than collected demurrage charges, would likely encourage carriers to be more rigorous in *their* collection of the charges. This, the agency maintained, would enhance the general regulatory effect of the demurrage system.[41]

■ Further, the ICC carefully weighed the benefits of the proposed rule against the claims of its opponents that demurrage remittance, by reducing railroad revenues and requiring additional administrative expenses, would place undue economic burdens upon many carriers.[42] The ICC found that many of the projections set forth by the objecting carriers were based on short-term start-up expenses, and therefore were

further use, and thereby loses revenue. This is especially true of private car owners who do not receive per diem but a mileage allowance. This remitted amount which table 5 shows is approximately $22 for each excess day ($11 if it is assumed that Service Order No. 1124 inflated demurrage by 50 percent), which SP estimates to be approximately $62.50 a car annually, will be an added dividend to car owners. When these figures are multiplied by the vast number of cars in the transportation system, the rule will certainly have a significant positive impact on car supply.
*Id.*

41. 349 ICC at 435–36. The ICC elaborated as follows:

The shipper to whom the carrier delivers a car pays the demurrage. He has control of the car and determines how long he will hold it. One of the factors he will consider in deciding how long to detain a car is the amount of the demurrage charges.

This proposal does not alter the level of demurrage charges. It merely shifts the payment of part of these charges from one group, the receiving carrier, to another, the car owner. Since it can make no difference to the shipper whether he pays the charge to one party rather than another, it may appear that the implementation of this proposal would have no impact on car utilization.

However, evidence collected by the Commission staff in another proceeding suggests that this proposal may have a positive impact on car utilization. The Commission has issued a Notice of Proposed Rulemaking and Order in Ex Parte No. 285, *Maintenance of Records Pertaining to Demurrage, Detention, and Other Related Accessorial Charges by Rail Common Carriers of Property.* In that notice and order, served August 16, 1972, we indicated that inquiries by the Commission's field staff revealed that large sums of money resulting from demurrage charges remained uncollected by the carriers or that such debts were canceled because carriers did not main-

tain adequate records. Other indications that carriers do not always collect demurrage charges appear in *Demurrage Rules and Charges, Nationwide*, 340 I.C.C. 83, 92 (1971), and *Incentive Per Diem Charges— 1968*, 337 I.C.C. 217, 233 (1970).

When carriers do not actually collect demurrage charges, an important economic incentive for shippers to release cars with dispatch is lost. Under the proposal herein, the car owner would receive part of these demurrage payments. Faced with the necessity of paying these sums to the car owner, the delivering carrier would have added motivation to pursue the charges against the shippers and receivers. The incentive to release cars would be greater and some improvement in car utilization could reasonably be expected.
*Id.*

42. The short-line railroads, in particular, have expressed their strong concern about the possible detrimental impact of the remittance scheme upon their operations. Their claims, whether legitimate or not, are not determinative. Rather, they are but one of several considerations relevant to ascertaining the rationality of the ICC's rule. As a unanimous Supreme Court reasoned in a proceeding quite similar to the present one:

It may be conceded that the immediate effect of the Commission's order will be to disrupt some established practices . . ., and on occasion to cause serious inconvenience . . . If the Commission were thrusting these regulations upon an admittedly smoothly functioning transportation industry . . . the rationality of its action might well be open to question. But such is not the case.

*United States v. Allegheny-Ludlum Steel*, 406 U.S. at 753, 92 S.Ct. at 1948 (upholding car service rules requiring the return of freight cars in the direction of the lines of the railroads owning the cars).

subject to question. Thus, the agency concluded that the benefits of the proposed rule outweighed the burdens.[43] Having reviewed the ICC's reasoning, we are unable to say that the agency's solution is not "rationally supported." [44]

### C.

Petitioners further contend that the ICC's order in Ex Parte No. 289 must be set aside for failure to comply with certain procedural requirements of the APA, 5 U.S. C.A. § 553(c) (1977), and of the ICA, 49 U.S.C.A. § 17(14)(b) (Supp.1978).

### 1.

Section 553(c) provides in pertinent part that "[a]fter consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise and general statement of their basis and purpose." It is the petitioners' position that this section requires that the statement by the agency be supported by more than conclusory assertions, and that the ICC remittance rule is invalid because of the agency's failure to comply with this requirement.

Those courts which have considered the issue agree that § 553(c) is designed to facilitate meaningful judicial review of agency action.[45] When engaging in such review, courts have expressed their intention to limit their scrutiny to the actual reasoning set forth by the agency.[46] Thus, *post hoc* rationalizations advanced in the

---

**43.** 353 ICC 589–91. The ICC declared in its final report:

> In conclusion, we realize that the cost data submitted by many of the reporting roads is inflated and that many of the expenses are unsubstantiated. (For example, a carrier states that it needs four additional employees but it does not indicate how it arrived at this figure.) However, despite our reservations as to the accuracy of the cost data presented, even taking it at face value, we are nevertheless unable to find that the costs of administering the rule are excessive. As can be seen from table 4, average startup expenses of $14,219 and annual expenses of approximately $0.90 for each excess demurrage day are not unreasonable, unjustifiable, or unduly burdensome. Even if expenses were slightly higher, the evidence of record still supports the finding that the costs of administering the rule are not prohibitive.
>
> The record also indicates that in terms of cost-benefit, the proposed rule is justified. Table 5 shows that the total amount of demurrage that would have been remitted for the period July 1 through December 31, 1973, to private and foreign car owners by 42 roads is $40,387,455. Even if we discount the effects of Service Order No. 1124, which inflated this figure by an estimated 50 percent, $20,193,727 would still have been remitted to car owners during this 6-month period. This discounted amount would constitute between a $10 and $11 return on a car owner's investment for each excess demurrage delay. When this amount is compared to the costs of administering the rule, it becomes evident that the costs are not so burdensome as to outweigh the rules's benefit in providing an incentive for the purchase of additional equipment and, thereby, in increasing car supply.

*Id.* at 590–91.

**44.** In light of the ICC's extensive discussion of the benefits and burdens of the demurrage remittance rule, we are also unable to accept petitioners' contention that the agency has failed to provide this Court with a basis for determining whether the proposed rule comports with the National Transportation Policy, 49 U.S.C.A. prec. § 1 (Supp.1978). *See generally A. L. Mechling Barge Lines, Inc. v. United States,* 376 U.S. 375, 84 S.Ct. 874, 11 L.Ed.2d 788 (1964); *Schaffer Transp. Co. v. United States,* 355 U.S. 83, 78 S.Ct. 173, 2 L.Ed.2d 117 (1957).

**45.** *See, e. g., Tabor v. Joint Bd. for Enrollment of Actuaries,* 185 U.S.App.D.C. 40, 44–47, 566 F.2d 705, 709–12 (1977); *Alabama Ass'n of Ins. Agents v. Board of Governors of the Fed. Reserve Sys.,* 533 F.2d 224 (5th Cir. 1976), *amended,* 558 F.2d 729 (5th Cir. 1977), *cert. denied,* 435 U.S. 904, 98 S.Ct. 1448, 55 L.Ed.2d 494 (1978); *National Nutritional Foods Assoc'n v. Weinberger,* 512 F.2d at 701. *See generally* Pedersen, *Formal Records and Informal Rulemaking,* 85 Yale L.J. 38, 73–4 (1975); Note, *The Judicial Role in Defining Procedural Requirements for Agency Rulemaking,* 87 Harv.L.Rev. 782 (1974). *See also Atchison, T. & S. F. Ry. Co. v. Wichita Bd. of Trade,* 412 U.S. 800, 807, 93 S.Ct. 2367, 37 L.Ed.2d 350 (1973); *SEC v. Chenery Corp.,* 332 U.S. 194, 196–97, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947); *American Iron & Steel Inst. v. EPA,* 568 F.2d at 296–7; *Dry Colors Mfrs. Ass'n Inc. v. Department of Labor,* 486 F.2d 98, 104 n. 8 (3d Cir. 1973).

**46.** *See Tabor v. Joint Bd. for Enrollment of Actuaries,* 566 F.2d at 710.

course of judicial review have been considered insufficient bases for sustaining an administrative action.[47]

■ However, in recognition of the limited purpose of the statement requirement of § 553(c), the provision has not been seen as a vehicle for searching judicial oversight of agency decision-making.[48] As the District of Columbia Court of Appeals made clear in *Tabor v. Joint Board for Enrollment of Actuaries*, the mere failure to publish the statement of the rule's basis and purpose at the same moment as the regulations are published does not constitute a violation of § 553(c).[49] Rather, "[t]he enquiry must be whether the rules and statement are published close enough together in time so that there is no doubt that the statement accompanies, rather than rationalizes the rules."[50]

■ In the present situation, the ICC's notices in the *Federal Register* of the proposed further rulemaking and of the final rule themselves satisfy the requirement of § 553(c).[51] In addition, there can be little doubt that the ICC Interim Report as well as its final Report and Order more than fulfill the statutory purpose of facilitating judicial review.[52]

2.

The contention of petitioners regarding the time requirements set forth in the ICA, 49 U.S.C.A. § 17(14)(b) (Supp.1978), presents a more difficult problem. That section provides: "*Within one year after February 5, 1976,* [the date of the enactment of this subdivision] the Commission shall conclude or terminate, with administrative finality, any *formal investigative proceeding* with respect to a common carrier by railroad which was instituted by the Commission on its own initiative and which has been *pending before the Commission for a period of three or more years* following the date of the order which instituted such proceeding."[53]

Petitioners argue that the proceeding here was a "formal investigative proceeding", that it was pending before the ICC for a period of more than three years subsequent to the initiation of the proceeding, and that it continued for more than one year after the enactment of § 17(14)(b). They maintain that the appropriate sanction for such a violation of the section is the setting aside or dismissal of the proceeding. Respondents, on the other hand, answer that the proceeding here was an informal one; that the ICC's Notice of Proposed Further and Amended Rulemaking and Order initiated a proceeding that was separate from that instituted in 1972 by the ICC's initial notice in Ex Parte No. 289; and thus that the time limitations were not transgressed. In any event, they insist that dismissal is neither required nor appropriate.

Recent opinions of several courts of appeals have consistently distinguished between "informal rulemaking" under the APA, 5 U.S.C.A. § 553 (1977), which need not be conducted with the procedural formalities of a trial, and "formal rulemaking" under 5 U.S.C.A. §§ 556 and 557 (1977), which is required to have an evidentiary hearing.[54] There is no disagreement among the parties here that Ex Parte No. 289 comes within the former category, that of "informal rulemaking." Respondents seek to establish that, because the proceeding in

**47.** *Id.*

**48.** *Id.*

**49.** 566 F.2d at 711.

**50.** *Id.* at n. 14.

**51.** *See* 40 Fed.Reg. 18797 (1975); 42 Fed.Reg. 19146 (1977).

**52.** The Supreme Court has previously found a "comprehensive" ICC report to "fully comply" with the requirement of § 553(c). *See United States v. Allegheny-Ludlum Steel Corp.,* 406 U.S. at 747, 758, 92 S.Ct. 1941, 32 L.Ed.2d 453.

**53.** 49 U.S.C.A. § 17(14)(b) (Supp.1978) (emphasis added).

**54.** *See, e. g., National Ass'n of Food Chains, Inc. v. ICC,* 175 U.S.App.D.C. 346, 351, 535 F.2d 1308, 1313 (1976); *Buckeye Power, Inc. v. EPA,* 481 F.2d 162, 170 (6th Cir. 1973); *Phillips Petroleum Co. v. FPC,* 475 F.2d 842, 851 (10th Cir. 1973), *cert. denied,* 414 U.S. 1146, 94 S.Ct. 901, 39 L.Ed.2d 102 (1974).

question is "informal" for purposes of the APA, it is also "informal" for purposes of the ICA, 49 U.S.C.A. § 17(14)(b) (Supp. 1978).

We disagree. The ICC offers no evidence or reasoning to support the assertion that Congress, when drafting § 303 of the 4R Act, which amended the procedural requirements of the *ICA,* had in mind the characterization that several courts have given to notice and comment rulemaking under the *APA,* 5 U.S.C.A. § 553. In the absence of any evidence, such a congruence seems to us implausible. While the purpose of the APA is to establish general procedural guidelines for a broad range of administrative agencies,[55] the ICA applies to a much *narrower set of circumstances.* Thus, it is reasonable to believe that Congress, when drafting the 4R Act amendments to the ICA, was thinking in terms of the particular problems of the ICC and the railroad industry.[56]

Indeed, such an interpretation of congressional intent is affirmatively supported by the available legislative history of § 17(14)(b). Paragraph (14)(b) was added to § 17 of the ICA in 1976, as part of Congress' broad attempt in the 4R Act to expedite ICC procedures. Congress was particularly concerned with the lengthy delays traditionally accompanying railroad-related matters. Thus, in § 303(a) of the 4R Act, 49 U.S.C.A. § 17 (Supp.1978), deadlines were established by Congress for the completion of evidentiary proceedings by ICC

sub-units, the submission of initial reports to the full ICC, and the consideration and final disposition of administrative appeals. *Furthermore, in § 303(b) of the 4R Act,* Congress established deadlines for the disposition of "any formal investigative proceeding with respect to a common carrier by railroad." We are unable to find any indication, either on the face of the 4R Act or in the legislative history, that Congress intended proceedings such as Ex Parte No. 289 to be exempt from a statutory time requirement.[57]

It is not without significance that the ICC, in its annual reports to Congress, has consistently designated notice and comment rulemaking proceedings such as the present one as "formal proceedings".[58] In contrast, informal proceedings have included such ICC activities as applications for temporary authority to operate a motor vehicle, applications to deviate from regular routes, and applications for temporary authority to lease or control. It is most likely that it was this categorization of proceedings that Congress had in mind when drafting § 17(14)(b).

■ Consequently, we hold that Ex Parte No. 289 constituted a "formal investigative proceeding" under the ICA, 49 U.S.C.A. § 17(14)(b), and that the statute's time requirements are therefore applicable.[59]

Nevertheless, we do not believe that the ICC's failure in this case to comply with the statutory deadline requires us to dismiss the

---

**55.** *See Wong Yang Sung v. McGrath,* 339 U.S. 33, 70 S.Ct. 445, 94 L.Ed. 616 (1950).

**56.** This is evident from the text of the 4R Act itself. *See* Pub.L.No.94–210, 90 Stat. 31 (1976).

**57.** Indeed, that Congress intended § 17(14) to be applied broadly is indicated by the congressional comments, although few in number, that were made during the drafting of the section. *See, e. g.,* Final Conference Report, S.Rep. No.595 and H.R.Rep.No.781, 94th Cong., 2d Sess. 162, U.S.Code Cong. & Admin.News 1976, p. 177: "The conference substitute follows the House bill except that it incorporates the Senate provision that . . . all proceedings instituted by the Commission shall be concluded with administrative finality, within 3 years after such proceeding was initiated."

**58.** *See, e. g.,* 91 ICC Ann.Rep. 111 (1978); 89 ICC Ann.Rep. 101–2 (1976).

**59.** We decline to accept the ICC's contention that Ex Parte No. 289 was actually two proceedings. The ICC claims that the April 1975 Notice of Proposed Further and Amended Rulemaking began a new rulemaking proceeding which merely capitalized on the efforts of the earlier activity. In light of the ICC's own language in the Interim Report and the April 1975 notice to the effect that the reopening was simply a continuation of the earlier proceeding, we find the ICC's argument before us to be unconvincing.

proceedings. Section 17(14)(b), applying to proceedings initiated prior to the enactment of that section, contains no express sanction for noncompliance as does § 17(14)(a), which pertains to ICC investigations begun since the provision's enactment.[60] This distinction in the language of the two sections indicates a desire on the part of Congress not to place ongoing proceedings under the same absolute time limit as proceedings instituted subsequent to the enactment of the 4R Act.

Furthermore, we are unconvinced that, as an equitable matter, injunctive relief barring enforcement of the ICC's order would be at all appropriate in this instance. While § 17(14)(b) evidences a congressional desire to eliminate delay in ongoing ICC proceedings, this purpose is but one of several that animated the 4R Act. Accordingly, it is necessary to balance the congressional aim of eliminating delay against the equally strong goals of revitalizing the nation's railroad system and alleviating the boxcar shortage. In light of these competing purposes, and of the vast resources that have obviously been expended in the course of Ex Parte No. 289, to enjoin the proceeding at this juncture would appear to be inappropriate. Furthermore, petitioners have failed to offer any evidence that they have been unduly prejudiced by the addi-

tional delay of two months beyond the statutory limit.[61]

We therefore hold that, while the ICC has exceeded the time limitations established by § 17(14)(b), dismissal here is neither required nor warranted.

### D.

Petitioners' final claim is that the ICC rule, by including private car owners in the demurrage remittance scheme,[62] permits the payment of unlawful rebates in violation of 49 U.S.C. §§ 15(15)[63] and 41(1).[64] It is contended that these sections will be violated by the order, since the payment by a railroad for the use of a private freight car will exceed the owner-shipper's cost of furnishing the car, and since the receiving carrier will in effect be paying an allowance which will not be published in its tariffs for the use of a car.

We have given careful consideration to these arguments and conclude that petitioners have misconstrued the purposes of § 15(15) and § 41(1), as well as the concept of demurrage. Sections 15(15) and 41(1) were designed to ensure reasonable and nondiscriminatory rates and charges, and to prevent any type of departure from

**60.** 49 U.S.C.A. § 17(14)(a) (Supp.1978) provides: "Any formal investigative proceeding with respect to a common carrier by railroad which is instituted by the Commission after February 5, 1976, shall be concluded by the Commission with administrative finality within 3 years after the date on which such proceeding is instituted. Any such proceeding which is not so concluded by such date shall automatically be dismissed."

**61.** Obviously, such a demonstration of prejudice would have been particularly difficult for petitioners to make, since the two-month delay beyond the statutory limit merely served to further postpone the eventual enforcement of the order to which they object.

**62.** In its final Report and Order, the ICC reasoned that: "An increasing percentage of the Nation's carrier fleet is owned by private interests. The evidence shows that between 1972 and 1974 private car owners and shippers added 35,711 cars to the transportation system. These investors should receive a fair return on

their investment as well as carriers." 353 I.C.C. at 594.

**63.** 49 U.S.C.A. § 15(15) (Supp.1978) provides: "If the owner of property transported . . . directly or indirectly renders any service connected with such transportation, or furnishes any instrumentality used therein, the charge and allowance therefor shall be published in tariffs . . . and shall be no more than is just and reasonable and the Commission may . . . determine what is a reasonable charge as the maximum to be paid . . . ."

**64.** 49 U.S.C.A. § 41(1) (Supp.1978) makes it unlawful "to offer, grant, or give, or to solicit, accept, or receive any rebate, concession, or discrimination in respect to the transportation of any property . . . whereby any such property shall by any device whatever be transported at a less rate than that named in the tariffs published and filed by such carrier . . . or whereby any other advantage is given or discrimination is practiced."

published transportation rates.[65] In contrast, the essential nature of demurrage is that of a car service regulation.[66] Consequently, we do not believe that a demurrage charge can properly be understood as a "rate" under § 41(1), or as a "charge" as that term is used in § 15(15). Unlike the use of the terms in those provisions,[67] demurrage remittance relates not to rail carriers' property, but to excessive delay caused by the shipper or receiver in the loading or unloading of freight cars. Furthermore, it is neither a "charge and allowance" paid by the railroads for use of freight cars nor a reduction of the railroads' rates for owner-shippers. Rather, demurrage is a cost imposed upon the receiver, the penalty portion of which will be transmitted to the owner by the delivering carrier.

As Judge Prettyman observed in his oft-quoted opinion in *Iversen v. United States* : [68]

> [D]emurrage charges are in part compensation and in part penalty; . . . in full character they are neither, *not being rates as that term is used in connection with rate-making*, nor penalties as that term is used in respect to penal impositions. They are *sui generis*. Historically, textually, in purpose and in content, they are an integral part of the established rules and regulations relating to the use and movement of cars. From the beginning they have been sustained as rules and regulations. They *could not have been sustained as carrier charges* or as penalties.[69]

As a result, we are unable to say that the inclusion of private car owners in the ICC's demurrage remittance order is a violation of the ICA.

### III.

For the reasons herein set forth, the petition to set aside the order of the ICC in Ex Parte No. 289 will be denied.

---

**65.** *See United States v. Braverman,* 373 U.S. 405, 406, 83 S.Ct. 1370, 10 L.Ed.2d 444 (1963) (unanimous); *El Dorado Oil Works v. United States,* 328 U.S. 12, 66 S.Ct. 843, 90 L.Ed. 1053 (1945).

**66.** *See ICC v. Oregon Pac. Indus., Inc.,* 420 U.S. 184, 190, 95 S.Ct. 909, 43 L.Ed.2d 121 (1975) (unanimous).

**67.** *See* notes 64 and 65 *supra.*

**68.** 63 F.Supp. 1001 (D.D.C.1946), aff'd mem., 327 U.S. 767, 66 S.Ct. 825, 90 L.Ed. 998 (1946).

**69.** *Id.* at 1005, *cited with approval in ICC v. Oregon Pac. Indus., Inc.,* 420 U.S. at 190 n. 7, 95 S.Ct. 909, 913 (emphasis added). In reaching this conclusion, Judge Prettyman relied in part on the opinion of the Virginia Supreme Court of Appeals in *Norfolk & W. R. Co. v. Adams, Clement & Co.,* 90 Va. 393, 18 S.E. 673 (1894). His discussion of that case is of particular relevance to the present proceeding:

In 1894 the Virginia Supreme Court of Appeals considered the validity of a demurrage charge in view of a state statute which forbade a railroad to charge any fee or commission "other than the regular transportation fees, storage, and other charges authorized by law." The official report of the matter says:

"The company had made a rule, of which plaintiffs had notice, that a charge of $1 per car per day would be made for every detention of a car for the purpose of loading or unloading beyond seventy-two hours from the time that the car was placed at the disposal of the shipper or consignee, as the case might be."

The court said:

"It [the demurrage charge] is neither a transportation charge, nor a storage charge, nor a terminal charge, nor a subterfuge for adding to the cost of transportation in excess of the rates prescribed."

The court sustained the charge on the ground that after allowance of a reasonable time for unloading, the railroad "can make reasonable rules and regulations and charges for such service as bailee, as it may see fit," and said, "Such charges are *not carrier charges* in the meaning, intendment, or prescription of the statute."

Thus, the original support for the right of a railroad to impose a demurrage charge was that such charge constituted a reasonable rule and regulation in respect to the use of the car, the purpose being to prevent delay in loading and unloading.

*Iversen v. United States,* 63 F.Supp. at 1003–4.